# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY

## *Electronically filed*

_____
                                          )
FERGUSON ENTERPRISES, INC.,               )
                                          )
            Plaintiff,                    )
                                          )        C.A. No.   3:15-CV-656-DJH
v.                                        )
                                          )
GLENN HOLLENKAMP, KEITH RAGER,            )
STEVEN COLLINS, JASON WEMITT, ROBERT      )
RENN, and LOCKWOOD INTERNATIONAL,         )
INC.,                                     )
                                          )
            Defendants.                   )
_____ )

## COMPLAINT

Ferguson Enterprises, Inc. ("Ferguson" or "Plaintiff") brings this suit against Glenn Hollenkamp, Keith Rager, Steven Collins, Jason Wemitt, Robert Renn, (the "Individual Defendants"), and Lockwood International, Inc. ("Lockwood") (collectively with Individual Defendants, "Defendants"), and for its causes of action, states as follows:

## INTRODUCTION

1.      Over the span of only a few weeks, Lockwood, a competitor of Ferguson, has systematically raided and hired more than a dozen Ferguson employees nationwide, including its *entire* industrial division in Louisville, where Lockwood had no previous market presence.[1] Together with the Individual Defendants, Lockwood has, on information and belief, used Ferguson's trade secrets, confidential business information, and customer goodwill to unfairly

---

[1] Ferguson's industrial division is called Wolseley Industrial Group ("WIG"). In addition to the Individual Defendants, several other employees all left Ferguson and joined Lockwood in a matter of days between June 4 and 8, 2015, in another systematic raid by Lockwood in other regions of the country. Those individuals are not named as defendants in this action. Ferguson's investigation is ongoing, and it respectfully reserves all of its rights and remedies against Lockwood and these other individuals.

gain an immediate foothold in the Ohio Valley, a market in which Lockwood previously had no presence, without investing the time and resources it would have had to undertake in the normal course of business.

2.      This campaign appears to have been conceived of, and is being carried out in conjunction with Lockwood in the Ohio Valley primarily by two individuals:  Defendant Glenn Hollenkamp, a former management-level WIG employee at Ferguson's Louisville facility, who, upon information and belief, has effectively acted as a corporate "pied piper," luring away the other Individual Defendants, all of whom are subject to stringent confidentiality obligations to Ferguson; and Defendant Keith Rager, a WIG salesman in Louisville who downloaded and/or copied sensitive information from Ferguson's proprietary network in the final days of his employment (and unsuccessfully attempted to cover his tracks), and subsequently made off with proprietary documents early in the morning of the Saturday before he resigned and joined Lockwood.

3.      Indeed, Lockwood has set up a new facility just across the Ohio River in Jeffersonville, Indiana—which, on information and belief, is staffed entirely by former Ferguson employees.

4.      Upon information and belief, the Individual Defendants have each breached their respective confidentiality agreements with, and fiduciary duties to, Ferguson by using Ferguson's trade secrets and confidential business information to help Lockwood compete unfairly with Ferguson in the Ohio Valley.

5.      Upon information and belief, and based upon all of the objective circumstances and reasonable inferences drawn therefrom, Lockwood participated in, encouraged, and/or

directed some or all of the Individual Defendants' unlawful actions, and will benefit handsomely therefrom.

6.      Ferguson brings claims against each of the Individual Defendants for breach of contract, breach of the fiduciary duty/duty of loyalty, civil conspiracy, tortious interference with prospective business advantage, unfair competition, and misappropriation of trade secrets.   In addition, Ferguson brings claims against Defendant Rager for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq. ("CFAA").  Ferguson brings claims against Lockwood for intentional interference with contractual relations, aiding and abetting the Individual Defendants' breaches of their fiduciary duties, tortious interference with prospective business relationship, civil conspiracy, misappropriation of trade secrets, and unfair competition. Ferguson seeks injunctive relief and damages against all Defendants.

## PARTIES

7.      Plaintiff Ferguson is a Virginia corporation with a principle place of business in Newport News, Virginia, in Warwick County.

8.      Upon information and belief, Defendant Hollenkamp is a citizen of the State of Kentucky and resides at 2903 Autumn Ct., Prospect, Kentucky 40059, in Jefferson County.

9.      Upon information and belief, Defendant Renn is a citizen of the State of Kentucky and resides at 10311 Colonel Hancock Drive, Louisville, Kentucky 40291, in Jefferson County.

10.      Upon information and belief, Defendant Wemitt is a citizen of the State of Kentucky and resides at 8905 Sweet Bay Place, Louisville, Kentucky 40242, in Jefferson County.

11.      Upon information and belief, Defendant Rager is a citizen of the State of Indiana and resides at 402 Merryman Drive, Jeffersonville, Indiana 47130, in Clark County.

20560104v.3

12.     Upon information and belief, Defendant Collins is a citizen of the State of Indiana and resides at 5935 Pine View Court, Jeffersonville, Indiana 47130, in Clark County.

13.     At all relevant times prior to their resignations, the Individual Defendants were highly paid employees of Ferguson at its Louisville, Kentucky facility.

14.     Upon information and belief, Defendant Lockwood is a Texas corporation with a principle place of business in Houston, Texas, in Harris County.  Upon information and belief, Lockwood transacts business in numerous states throughout the country.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Ferguson's claim against Defendant Rager under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, raises a federal question.  Ferguson's remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.  Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

16.     This Court has personal jurisdiction over the Individual Defendants because, *inter alia*, they have made and performed contracts in Kentucky and/or have breached duties and/or committed tortious acts in Kentucky.  This Court has personal jurisdiction over Lockwood because it has committed tortious acts in Kentucky by, *inter alia*, interfering with contracts made and performed in Kentucky.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this dispute occurred within this District.

20560104v.3

## FACTUAL ALLEGATIONS

### A.    *Ferguson's Business*

18.     Ferguson operates in the wholesale plumbing supply industry, a highly competitive, specialized industry. The industrial Pipe, Valve, and Fitting ("PVF") segment of the industry, in which WIG is specifically engaged, is even more competitive and specialized.

19.     Ferguson has been in continuous operation since 1953, and WIG was formed in August of 2011. WIG is a PVF Supplier, specializing in delivering actuation, instrumentation, engineered products, and turn-key solutions. This includes being a provider of supply chain management solutions for a full range of maintenance, repair, and operations ("MRO") supplies with a focus on delivering significant cost savings across the entire supply chain.

20.     WIG is engaged in business to business sales, and thus has a small number of very large customers. These customers have a very long sales cycle, and often award multi-year contracts for which companies such as WIG have to qualify based on numerous factors determined by the customer, such as their geographic reach, product mix and availability, and quality control programs. Some customers work in multiple different plants, each of which has its own list of approved manufacturers, so a company like WIG must expend a great deal of time and resources learning about a particular customer before it can become qualified. In short, qualifying for and building relationships with customers takes an enormous investment of time, energy, and capital, and cannot be done overnight.

21.     WIG also works with a network of vendors whose products WIG sells to customers. Such vendors often have their own relationships with WIG's customers, so WIG and the vendors will sometimes team up to obtain new business.

5

**B.**    *Ferguson's Confidential Information and Trade Secrets*

22.    Ferguson has invested considerable money and effort to develop trade secrets and confidential business information.  Since its inception in 1953, Ferguson has maintained as confidential certain highly valuable proprietary business information regarding, among other things, its operations, services, technology, customers, vendors, finances, pricing, sales and marketing strategies, business development proposals and prospects, and employee information.

23.    Ferguson stores such confidential information in a secure, proprietary, homegrown network called Trilogie.  Ferguson has invested considerable time, effort and expense over more than 25 years into building and growing Trilogie, at an estimated cost of tens of millions of dollars.

24.    Among other things, Trilogie contains all customer and prospective customer information, including details of customer orders, details of customer lists, customer support information, bid histories, prices, margins, inventory, accounts receivable, orders, product information, and the like.  The information contained in Trilogie is gleaned from Ferguson's research, customer inquiries, and customer account history, and most of it is not publicly available.  Certainly, the compilation of such information is not public.

25.    Only management and sales-related employees (such as the Individual Defendants) are granted access to customer information in Trilogie.  Authorized users must first sign into Ferguson's secure network using a valid username and password, and then must sign in separately to Trilogie, where, depending on one's level, responsibilities, and business need, certain levels of access to information are provided.  The level of access provided to each employee is determined by the employee's branch manager and is audited by Ferguson every six to twelve months for appropriateness.

20560104v.3

26.    Employees may also log into Trilogie remotely through a secure virtual private network ("VPN"), for which they must enter an entirely separate password.

27.    Passwords for both the network and VPN access are required to be updated every 90 days, and must include three of the following four characteristics: an uppercase letter, a lowercase letter, a number, and/or a special symbol.  A new password may not have been one of the employee's previous five passwords.

28.    When an employee logs into the network, locally on their computer and when connecting remotely using VPN, a warning banner pops up reminding the employee of his or her obligations with respect to maintaining the confidentiality of any information contained therein.

29.    Trilogie contains approximately 12 to 24 months of historical information.  Older information (as far back as approximately 2005) is moved to a storage platform (Ferguson's "Data Warehouse").  Ferguson also employs a program called Cognos for generating reports based on the historical information from the Data Warehouse.  Certain employees, again depending on a variety of factors (and including the Individual Defendants), are provided access to Trilogie and Cognos.

30.    The proprietary business information contained in Trilogie and the Data Warehouse is not available or readily ascertainable to the public (or even, as noted above, to much of its workforce) and is considered a closely-guarded trade secret by Ferguson.

31.    In part through the use of its proprietary business information and years of business effort, Ferguson has been able to develop the trade and the patronage of its customers. The goodwill developed with its customers depends, in large part, on Ferguson's proprietary business information as described above.  This information is integral to Ferguson's efforts at

developing and maintaining its goodwill and, consequently, constitutes a trade secret and/or proprietary, confidential information.

32.     Because this confidential information is so important to its business, in addition to restricting access to the information, Ferguson makes extensive efforts to protect this asset.  For instance, Ferguson requires that employees with access to such information execute an "Agreement of Confidentiality" (the "Confidentiality Agreement") which provides, among other things, that the employee is not to discuss any confidential information obtained during his or her employment with Ferguson to any third parties, including, without limitation, customers, competitors, and the media, as well as other Ferguson employees "who do not have an authorized 'need to know' the information."  Confidential information is defined in the Confidentiality Agreement to include, without limitation, "information concerning pricing, profit margins, marketing strategies, acquisitions, customers lists, quotations and other information not generally known in the market."

33.     The Confidentiality Agreement further provides that the duty not to disclose and use Confidential Information survives the termination of the employee's employment, that any improper use or disclosure of Confidential Information will cause irreparable injury, and that "[i]n the event that it is necessary to enforce this agreement in a court of law or equity, [employee] agree[s] to pay all costs of enforcement including reasonable attorney fees."

34.     Each of the Individual Defendants signed the Confidentiality Agreement, true and accurate copies of which are attached hereto as Exhibit A.

35.     Ferguson also requires all employees to sign, upon commencement of their employment, a "Certificate of Receipt & Acknowledgement of Compliance" ("Acknowledgement") with Ferguson's Code of Ethics & Standards of Business Conduct (the

20560104v.3

"Ethics Code"), stating that the employee understands that he or she is responsible for reading and becoming familiar with the Ethics Code, and periodically reviewing the Ethics Code to remain familiar with its requirements; and agreeing that the employee will abide by the Ethics Code throughout his or her employment with Ferguson.

36.    Each of the Individual Defendants signed the Ethics Code Acknowledgement, true and accurate copies of which are attached hereto as Exhibit B.

37.    Among other things, the Ethics Code provides that each employee is "personally responsible for safeguarding and protecting the assets and property of the Company," including, without limitation, Ferguson's confidential information and trade secrets, and any computers or other electronic devices provided to them.

38.    With respect to employee confidentiality obligations, the Ethics Code provides:

> When an associate is entrusted with confidential information about the Company's business activities or development plans, it is that associate's responsibility to keep such information confidential. Associates may not act on such information for personal gain before it has been made public.

> Likewise, associates must not misuse confidential information from other companies with which they have been entrusted. Proprietary information of other companies entrusted to our possession, including matters covered by confidential agreements, must also be protected. Examples of confidential information include earnings figures, possible acquisitions or divestitures, significant new products or processes or contract awards. Allowing such information to become public could injure the Company and adversely affect interested persons.

> Associates must not share proprietary information with fellow associates who are not specifically authorized to received it. Secrets that are passed from one person to another soon cease to be secrets. Careless discussions outside the Company about confidential information must also be avoided. All financial information must be treated in accordance with policies and procedures established by the Company's Chief Financial Officer and may not be disclosed to any third party without prior approval by such officer.

39.    The Ethics Code, in addition to being provided to new employees for their signature, is published on Ferguson's intranet site, called "Pipeline."

40.     Similarly, all Ferguson employees are subject to its "Acceptable Usage Policy For Computing Resources" ("AUP"), a true and accurate copy of which is attached hereto as <u>Exhibit C</u>.

41.     Among other things, the AUP provides that:

4.2.5   Highly-sensitive information, such as: credit card numbers, company financial information, or legally-regulated employee data must be protected from unauthorized use or disclosure.  To protect this information it should never be sent via unprotected email, text message (SMS) or instant message.  Wherever possible, this information should not be stored on laptops or workstations unless encrypted. . . .

. . . .

4.4.3   Users are individual accountable for all activities attributed to the computing resource accounts assigned to them.  Therefore, users must not provide or share access with any unauthorized person, including family members and co-workers.

. . . .

4.4.6   Intentional attempts to gain unauthorized access to Wolseley Computing Resources may result in legal or disciplinary action. . . .

4.4.7   Even when authorized to access Wolseley Computing Resources, users must refrain from accessing sensitive information, such as other user's email or financial reports, without a direct business purpose.

. . . .

4.6.1   Users are expected to reasonably protect computing resources within their care from theft, damage, or unauthorized access.  . . . .

. . . .

5.   Ownership.  The company maintains ownership of any intellectual property created on its Computing Resources, unless specified by contract or law.

6.   Compliance. . . . Any employee/associate that disregards this policy will be subject to disciplinary action, up to and including termination of employment, at the discretion of management.   Any non-Wolseley employee or collaborating company found in violation of these policies may be subject to penalties, cancellation of contract, or other legal actions.

20560104v.3

42.    In addition, the AUP outlines the password requirements discussed above.  *See id.*, § 4.5 Password Protection.

43.    Ferguson also routinely enters into nondisclosure agreements ("NDAs") with its customers and vendors to protect sensitive business information, including as part of the bid process.  The Individual Defendants are all well aware of, and have been involved in entering into, such NDAs with both customers and vendors.

44.    As just one example, Ferguson will sometimes provide its approved manufacturer list to a potential customer as part of a bid or otherwise.  This list was created and has been fine-tuned as a result of extensive research and quality control checks performed by Ferguson, and is considered extremely confidential and proprietary.  As such, Ferguson will only provide the list to a customer under a strict NDA.  Some customers and vendors have similar lists, and they too will generally only provide them under strict NDAs.  The Individual Defendants are all aware of Ferguson's approved manufacturer list.

## C.    *Ferguson's Customer Goodwill*

45.    In addition, Ferguson has invested heavily in developing its goodwill with its customers based on its investment of time and expense in training, supporting, and entrusting its employees, including the Individual Defendants, with its valued customer relationships, and has spent considerable amounts of money over the years to enable the Individual Defendants to entertain and develop customers so as to foster those relationships, determine customer preferences, and produce better products and services based on the customers' unique needs.

46.    For example, Ferguson encourages employees (like the Individual Defendants) to entertain customers, and pays all expenses for customer dinners, fishing trips, and other entertainment (to the extent they conform to Ferguson's gift and entertainment policy, also

20560104v.3

contained in the Ethics Code), as well as conference fees and the like.  Indeed, the Individual Defendants took particular advantage of these policies and spent considerably on business development.

47.     Additionally, many of the Individual Defendants benefited from inherited customer relationships when they joined Ferguson.  Indeed, Defendants Hollenkamp, Rager, Collins, and Renn joined Ferguson when it acquired Pipe Products, Inc. in April 2006.  As part of that acquisition, Ferguson paid handsomely for Pipe Products' customer goodwill, among other things, and agreed to hire certain employees, including Hollenkamp, Rager, Collins, and Renn.  Several of Ferguson's largest customers in Louisville resulted from the Pipe Products acquisition.

48.     Ferguson has obtained other customers through nationwide bid processes, and has entrusted the oversight and development of those relationships to the Individual Defendants.

49.     Upon information and belief, the Individual Defendants are now using the goodwill entrusted to them by Ferguson on Lockwood's behalf and for Lockwood's benefit.

50.     The Individual Defendants, through their employment with Ferguson, gained unique knowledge of Ferguson's customers, products, and business strategy, among other things, which may be used to gain a competitive advantage against Ferguson.  The Individual Defendants had unique knowledge of what Ferguson's products could (and could not) do, as well as an understanding of Ferguson's development track for years to come.  Specifically, they had access to sales materials, pricing information, customer identification and contact information, and Ferguson's development plans, among other things.

20560104v.3

**D.    *Lockwood Is A Competitor Of Ferguson, And More Recently A Competitor Of WIG***

51.    Lockwood is a competitor of Ferguson.  Until very recently, Lockwood's business was focused primarily on valves and actuation.  It was only after Lockwood began raiding Ferguson that it held itself out to the public as a PVF supplier.

52.    Upon information and belief, Lockwood targets the same customer base as Ferguson in order to sell its products, and is marketing to both the customers and vendors with which Ferguson works—particularly since it hired the Individual Defendants.

53.    Prior to hiring the Individual Defendants and other former Ferguson employees, Lockwood had no facilities or market presence in the Ohio Valley.

**E.    *The Individual Defendants' Employment History And Agreements With Ferguson***

54.    Ferguson hired Hollenkamp on or about July 1, 2006 as Branch Manager.  During his employment with Ferguson, Hollenkamp was promoted to General Manager on or about August 1, 2008, to General Manager II on or about June 1, 2010, and to Category Sales Specialist V on or about May 1, 2015.  Hollenkamp signed the Confidentiality Agreement on June 7, 2006 and the Ethics Code Acknowledgement on the same date.

55.    Ferguson hired Renn on or about July 1, 2006 as an Inside Sales Representative.  During his employment with Ferguson, Renn was promoted to Inside Sales Manager on or about January 1, 2008.  Renn signed the Confidentiality Agreement on June 7, 2006 and the Ethics Code Acknowledgement on the same date.

56.    Ferguson hired Rager on or about July 1, 2006 as an Outside Sales Representative.  Mr. Rager signed the Confidentiality Agreement on June 7, 2006 and the Ethics

20560104v.3

57.    Ferguson hired Collins on or about July 1, 2006 as an Inside Sales Representative. Collins signed the Confidentiality Agreement on June 7, 2006 and the Ethics Code Acknowledgement on the same date.

58.    Ferguson hired Wemitt on or about June 21, 2004 as a Sales/Management Trainee.    During his employment with Ferguson, Wemitt was promoted to Inside Sales Representative on or about January 1, 2008, to Project Manager on or about March 3, 2012, to Project Management Manager on or about March 1, 2014, and to Inside Sales Representative IV on or about June 1, 2015.  Wemitt signed the Confidentiality Agreement on June 18, 2004 and the Ethics Code Acknowledgement on the same date.

**F.    _The Individual Defendants' Departures from Ferguson_**

59.    Defendant Hollenkamp resigned from his position at Ferguson on or about July 22, 2015, and, upon information and belief, immediately began working for Lockwood.

60.    On the same date, Defendant Rager resigned from his position at Ferguson as well, and also, on information and belief, immediately began working for Lockwood.

61.    Defendants Collins and Renn resigned from their positions at Ferguson the following day, July 23, 2015 and also, on information and belief, immediately began working for Lockwood.  Although Renn acknowledged that "two weeks['] notice is standard," he requested to be released from his employment as soon as possible, ostensibly so that he, too, could join Lockwood immediately.

62.    Defendant Wemitt resigned on July 21, 2015, and began working for Lockwood soon thereafter as well.

63.    Ferguson's normal practice when an employee departs is to conduct an exit interview, at which time the employee is reminded of his or her continuing obligations to the

20560104v.3

company, and asked to return his or her computers and other devices, among other things. The way in which the Individual Defendants departed, however, was not at all typical, and no exit interviews were able to be conducted.

64. Upon information and belief, Lockwood's current workforce in that area consists solely of former Ferguson employees.

65. By virtue of the loss of its *entire* industrial division in Louisville in a matter of days, Ferguson must expend a great deal of time and money to find and train qualified replacements. In addition to having to expend substantial resources on travel and training costs associated therewith, Ferguson will be forced to devote a great deal of its employees' time and energy to finding and training these new hires, leaving less time to foster its customer relationships and continue working on its products and services.

66. Moreover, on information and belief, Defendant Hollenkamp reached out to some of Ferguson's largest customers in the Ohio Valley prior to his departure from Ferguson to obtain commitments for business on behalf of Lockwood. Indeed, in the time immediately preceding Hollenkamp's departure, sales to customers dropped dramatically from their average daily numbers, and since Hollenkamp's departure, customers have begun sending orders to Lockwood.

67. Indeed, Lockwood's new facility in Jeffersonville, Indiana, clearly was located such as to be in close proximity to one of Ferguson's large customers, which Lockwood was not in a position to know without Hollenkamp's and perhaps other former Ferguson employees' input. Indeed, given the amount of time it takes to locate appropriate commercial space, negotiate and close a commercial lease, and the fact that Lockwood was up and running at that location immediately upon Hollenkamp's departure, on information and belief, Hollenkamp and

possibly other former Ferguson employees were involved in locating the facility and perhaps even negotiating its lease on behalf of Lockwood, all while still employed by Ferguson.

68.    The choreography of Lockwood's raiding of Ferguson employees in Louisville was also too well planned out to be coincidental.  Hollenkamp and several of the other Individual Defendants departed while their location supervisor, Tim Sell ("Sell"), and Sell's supervisor, Dominick Porcelli ("Porcelli"), were both on vacation and could do little to stanch the bleeding; as noted above, Lockwood's Jeffersonville, Indiana facility was ready to open for business upon the Individual Defendants' departures, and, on information and belief, even had inventory in stock; and Lockwood almost immediately began doing business with some of Ferguson's largest customers in the area, with whom, on information and belief, Lockwood had no prior business relationships.

69.    Yet another Ferguson employee in Louisville, Emily Milby, gave notice of her resignation and intention to join Lockwood on August 3, 2015, telling her supervisor that she was leaving because she feared Hollenkamp, and possibly other former Ferguson employees, were going to take all of Ferguson's industrial business away and that Ferguson would close the Louisville facility and leave her unemployed.

70.    Hollenkamp told yet another Ferguson employee in Louisville that he would have a job for the employee soon, and that it would be a far better opportunity than what he has now working for Ferguson.  On information and belief, this statement suggests that Lockwood is contemplating a second phase to its strategy of knocking Ferguson out of the Ohio Valley market, which will begin in earnest once it can secure more of Ferguson's top customers' business, whom it has already begun soliciting.

20560104v.3

**G.**    ***Rager's Wrongful, Unauthorized Use of Ferguson's Computers, and Theft of Ferguson Property***

71.    Upon termination of their employment with Ferguson, although there were no formal exit interviews as a result of the manner in which they departed, each of the Individual Defendants were verbally reminded of his or her obligation to return Ferguson assets, including computers and other electronic devices.    Each of the Individual Defendants returned their computers to Ferguson upon resignation, which Ferguson has begun analyzing.

72.    Ferguson created a forensic image of the contents of a USB thumb drive used by Rager during his employment with Ferguson, as well as a forensic image of the hard drive from the computer used by Rager during his employment with Ferguson.

73.    Using the forensic images, Ferguson analyzed the files contained on Rager's USB thumb drive and computer hard drive to determine what documents exist on those devices; when those documents were created, modified, or accessed; and whether any deletion activity occurred and when it occurred.    In addition, Ferguson analyzed records of Rager's internet traffic history from Ferguson's internet proxy server to determine whether there was evidence indicating that Rager exported or otherwise transferred information, files, or data outside of Ferguson via internet services.    Ferguson also analyzed the information on Rager's hard drive for any indication of the copying of information, files, or data from the computer to external storage media, such as an external hard drive or USB drive.

74.    Ferguson searched for evidence that documents had been deleted from Rager's computer hard drive prior to his resignation and departure from Ferguson.    When a file is deleted by a computer user, the file is moved to the Recycle Bin of the computer.    If the Recycle Bin is later emptied, it does not mean that the items are permanently deleted from the computer's hard drive.    Rather, it simply means that a user cannot access those documents without the use of

forensic tools, and the space on the hard drive once occupied by those files is flagged as free onto which new data may be written.

75.     During Ferguson's analysis of deleted files on Rager's computer hard drive, Ferguson completed the following:

(a)     Ferguson identified and recovered a deleted document entitled "July 24.docx" that originally had been located on the desktop of Rager's computer.  The document is a resignation letter from Rager to Mr. Marty Kaiser, dated "July 24, 2015" within the text of the document.

(b)     The electronic metadata associated with this recovered document indicates that it was authored by Rager and deleted the same day on 7/16/2015, seven days before Rager's resignation on 7/23/15.

(c)     Based on Ferguson's experience, when a user deletes a document and then empties the Recycle Bin, the user is attempting to delete the document permanently from the computer such that it should no longer be accessible to anyone.

(d)     Ferguson's investigation and analysis of deleted files on Rager's computer hard drive is ongoing.

76.     Based upon Ferguson's review of the file activity on the hard drive of Rager's computer workstation and his internet traffic history contained on Ferguson's internet proxy server, Ferguson determined the following:

(a)     A folder on Rager's computer hard drive entitled "Dropbox" was created on 9/8/2013 that contains documents to be synchronized to an external "Dropbox" account.  Dropbox is a cloud-based file hosting

20560104v.3

service that allows its users to upload documents to the Dropbox website and to synchronize those documents across any number of devices. The Dropbox software is not installed or supported by Ferguson.

(b)     The "Dropbox" folder on Rager's computer hard drive contains 130 sub-folders (101 of which are empty folders), 49 documents, and 179 "Dropbox Attribute" files. Dropbox Attribute files are temporary files, hidden from view for a normal computer user, that are created when a document or folder is added to the Dropbox folder to be synchronized with a Dropbox account. The 179 Dropbox Attribute files correspond directly to the 130 sub-folders and 49 documents in the Dropbox folder on Rager's hard drive, indicating that those sub-folders and documents had been synchronized with the Dropbox account.

(c)     The 49 documents and 130 sub-folders in the Dropbox folder have a "Created Date" of 7/22/2015, indicating that the files and folders were placed in the Dropbox folder on Rager's computer on that date.

(d)     Many of the documents found within the Dropbox folder contain Ferguson confidential information, including, for example, a file which is a detailed contact sheet for a Ferguson customer.

(e)     Ferguson's analysis of the internet traffic history contained on Ferguson's internet proxy server indicated that Rager connected to the Dropbox internet service throughout July and as recently as 7/22/2015, the day before Rager resigned.

20560104v.3

(f)  On information and belief, confidential and proprietary Ferguson documents were intentionally copied to the "Dropbox" folder for purposes of synchronizing and uploading those documents outside of Ferguson systems. The Create Date of 7/22/2015 for the documents and sub-folders in the Dropbox folder (indicating when they were placed there) taken together with the evidence of Rager's internet communication with a Dropbox account on 7/22/2015 are indicative of Rager uploading, synchronizing, and transferring the documents and folders to an external Dropbox account just prior to his resignation. In addition, the internet communication with the Dropbox service throughout the month of July 2015 is indicative generally of transferring files and documents outside of Ferguson.

(g)  Ferguson's investigation and analysis of the content of Rager's computer hard drive and his internet and network activity is ongoing.

77. Based upon Ferguson's analysis of the forensic image of the USB thumb drive, which on information and belief was returned by Rager on 7/23/2015, Ferguson determined the following:

(a)  The USB thumb drive contains 10,679 files. The overwhelming majority of the files on the USB drive have file Created Dates of June 14th, 16th and 27th, 2015 (6431 files) and July 15th, 16th, and 18th, 2015 (4248 files), indicating that the files were placed on the USB thumb drive on those dates, just days prior to Rager's resignation.

20560104v.3

(b)        Of the 10,679 files located on the USB thumb drive, 2,899 of them appear also to be located within a "D:\Documents" folder on Rager's computer hard drive.

(c)        On information and belief, a review of the documents found on the USB thumb drive indicated that a substantial number of the documents contain proprietary and confidential Ferguson information.

(d)        Ferguson's investigation and analysis of the content of Rager's USB thumb drive is ongoing.

78.    Ferguson has incurred more than $5,000 in costs in responding to Mr. Rager's computer offenses and analyzing and assessing the extent of his wrongful taking of information from Ferguson's computer systems.

79.    In addition, in early morning of Saturday, July 18, 2015, Ferguson security cameras and a Ferguson employee witnessed Mr. Rager acting suspiciously and, on information and belief, taking sensitive business information.  Specifically, Mr. Rager was seen exiting out the back door of the Louisville facility, to where he had moved his truck after entering through the main front door, with a tote bag and/or a box containing documents and at least one binder. There was no legitimate business purpose for Mr. Rager to have entered and exited  the facility in the way he did, nor is there any legitimate business purpose for him to have taken documents from the facility, particularly just days prior to his resignation from Ferguson and subsequent employment with Lockwood.

80.    Additionally, on July 21, 2015, Ferguson security cameras witnessed Hollenkamp, Wemitt, and Collins each exiting the Louisville facility with boxes and a backpack

20560104v.3

that, upon information and belief, contained sensitive business information.  Investigation of the Defendants activities continues.

**H.    _Ferguson's Futile Demands to Cease and Desist_**

81.    On August 4, 2015, counsel for Ferguson sent cease and desist letters to the Individual Defendants, which alerted them to the possibility of litigation and specifically referenced their "legal obligation to preserve, and not to delete, destroy, or alter any information or documentation, whether hard-copy or electronic, that may relate to [Ferguson's] concerns and potential claims as described herein."  True and accurate copies of these letters are attached hereto as Exhibit D.

82.    Also on August 4, 2015, counsel for Ferguson sent a letter to Mark E. Wise, outside counsel for Lockwood, alerting Lockwood to the possibility of litigation.[2]  This letter attached copies of the letters to each of the Individual Defendants, and likewise referenced Lockwood's "legal obligation to preserve, and not to delete, destroy, or alter any information or documentation, whether hard-copy or electronic, that may relate to [Ferguson's] concerns and potential claims as described herein."  A true and accurate copy of this letter is attached hereto as Exhibit E.

83.    On August 6, 2015, Attorney Wise sent an e-mail to Ferguson's counsel indicating his receipt of the aforementioned letters and stating that Lockwood has a policy prohibiting the use of competitor's confidential information, that his firm is investigating, and that he would respond "sometime next week," beyond the deadline set forth in the cease and desists letters, and included responses from those who had received cease and desist letters.

---

[2] He had received a similar letter, on or about June 9, 2015, regarding another recently departed Ferguson employee who joined Lockwood in Texas.

20560104v.3

Given the sensitivity of the information described above, and irreparable harm that may ensue, Ferguson cannot wait for the responses and must move forward with this litigation.

## COUNT I
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*
### Against Defendant Keith Rager

84.     Plaintiff repeats and realleges Paragraphs 1 – 83 above, and incorporates them as if fully set forth herein.

85.     Ferguson's computer systems comprise a protected computer that is used across state lines in interstate and/or foreign commerce and communication.

86.     By the conduct described above, Defendant Rager knowingly exceeded his authorized access and/or accessed Ferguson's computer systems without authorization for his own benefit and, upon information and belief, the benefit of his new employer, Lockwood.

87.     Defendant Rager's unauthorized actions caused both damage and loss to Ferguson.

88.     Through the above-described actions, Defendant Rager has:

A.     knowingly and with intent to defraud, accessed a protected computer without authorization, or exceeded his authorized access, and furthered his intended fraud and obtained something of value in violation of 18 U.S.C. § 1030(a)(4); and/or

B.     intentionally accessed a computer without authorization or exceeded his authorized access, and as a result of such conduct, obtained information from a protected computer 18 U.S.C. § 1030(a)(5)(C).

89.     Ferguson has suffered losses in excess of $5,000.00 in a one-year period to respond to Defendant Rager's offenses and to analyze and assess the extent of his wrongful taking of information from Ferguson's computers, as well as his attempts to delete any trail of his misconduct.

90.     As a result of Defendant Rager's wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury, for which there is no adequate remedy at law to compensate.

91.     By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

## COUNT II
### Breach of Contract Against The Individual Defendants

92.     Plaintiff repeats and realleges Paragraphs 1 – 91 above, and incorporates them as if fully set forth herein.

93.     Ferguson and each of the Individual Defendants entered into valid contracts, the Confidentiality Agreement and Ethics Code, during his employment with Ferguson.

94.     The covenants contained in the Confidentiality Agreement and Ethics Code remained in full force and effect through the Individual Defendants' departures from Ferguson, and the Individual Defendants, for good consideration, remained obligated to comply with those covenants.

95.     Ferguson satisfied all of its obligations under the terms and conditions of the Confidentiality Agreement and the Ethics Code.

96.     By the acts described above, the Individual Defendants have breached the Confidentiality Agreement and Ethics Code by using Ferguson's trade secrets and confidential information to solicit or encourage Ferguson's customers or potential customers to purchase products or services offered by Lockwood following the termination of their employment with Ferguson.

20560104v.3

97.     Upon information and belief, some or all of the Individual Defendants have also breached the Confidentiality Agreement and Ethics Code by using Ferguson's trade secrets and confidential information to solicit Ferguson's employees for Lockwood following the termination of their employment with Ferguson.

98.     As a result of the Individual Defendants' wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

99.     By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

## COUNT III
### Intentional Interference With Contractual Relations Against Lockwood

100.     Plaintiff repeats and realleges Paragraphs 1 – 99 above, and incorporates them as if fully set forth herein.

101.     By the acts described above, Lockwood has interfered with Ferguson's contractual relationships with the Individual Defendants.

102.      Lockwood knew or should have known that the Individual Defendants' use of Ferguson's trade secrets and/or confidential information constituted a breach of their respective Confidentiality Agreements and Ethics Code.

103.     By the acts described above, upon information and belief, Lockwood intended to use improper means in interfering with Ferguson's contractual relationships with the Individual Defendants without lawful justification or legitimate reason for this interference with these contractual relationships.

20560104v.3

104.    As a direct and proximate result of Lockwood's actions described above, the Individual Defendants have been induced to breach their respective agreements with Ferguson.

105.    As a result of Lockwood's wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

106.    By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

### COUNT IV
**Tortious Interference With Prospective Business Advantage
Against All Defendants**

107.    Plaintiff repeats and realleges Paragraphs 1 – 106 above, and incorporates them as if fully set forth herein.

108.    By the acts described above, the Defendants have interfered with Ferguson's prospective business relationships with its customers.

109.     The Defendants were aware of Ferguson's prospective business relationships with its customers.

110.    By the acts described above, upon information and belief, the Defendants intentionally and improperly interfered with Ferguson's prospective business relationships with Ferguson's customers, without lawful justification or legitimate reason for this interference.

111.    As a direct and proximate result of the Defendants' actions described above, the Ferguson's prospective business relationships with its customers have been harmed.  For example, immediately following Lockwood's hiring of the Individual Defendants, Ferguson's

sales to customers dropped dramatically from their average daily numbers, and Ferguson customers have begun sending orders to Lockwood.

112.   As a result of the Defendants' wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

113.   By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

## COUNT V
## Unfair Competition Against All Defendants

114.   Plaintiff repeats and realleges Paragraphs 1 – 113 above, and incorporates them as if fully set forth herein.

115.   By the acts described above, Lockwood has engaged in unfair competition that has harmed Ferguson.

116.   Specifically, upon information and belief, Lockwood raided the employees from Ferguson's Louisville Facility for the purpose of obtaining and using Ferguson's trade secrets and confidential information to solicit Ferguson's customers and to compete unfairly with Ferguson in the marketplace.

117.   Moreover, on information and belief, Lockwood aided and abetted the Individual Defendants' breaches of their respective agreements with Ferguson and thereby tortiously interfered with Ferguson's contractual relationships.

118.   As a result of Lockwood's wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

119.    By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

**COUNT VI**
**Misappropriation of Trade Secrets**
**Against All Defendants**

120.    Plaintiff repeats and realleges Paragraphs 1 – 119 above, and incorporates them as if fully set forth herein.

121.    By virtue of their employment at Ferguson and performance of responsibilities for Ferguson, the Individual Defendants were given access to and now possess trade secrets and confidential and proprietary business information belonging to Ferguson, described above, and including, without limitation, extensive information about Ferguson's customer and supplier identification and contacts, products, and business strategy.

122.    Ferguson took reasonable steps to preserve the secrecy of its confidential business information and trade secrets, which are not readily ascertainable by proper means and/or by persons without authorization.

123.    Ferguson's confidential business information and trade secrets have independent economic value.

124.    Upon information and belief, the Individual Defendants misappropriated, exploited, and misused Ferguson's protected trade secrets and/or confidential and proprietary information to benefit themselves and their new employer, Lockwood, in their own self-interest and to compete unfairly against Ferguson.

125.    The disclosure and use of such information by the Individual Defendants constitutes a misappropriation of trade secrets and/or confidential and proprietary business information in violation of the Kentucky Uniform Trade Secrets Act, KRS §§ 365.880, *et seq*.

126.    Upon information and belief, Lockwood misappropriated Ferguson's protected trade secrets when it acquired the trade secrets from the Individual Defendants and Lockwood knew, or should have known, that the Individual Defendants acquired the trade secrets by improper means.

127.    Upon information and belief, Lockwood knowingly benefited from the Individual Defendants' misappropriation of Ferguson's trade secrets.

128.    As a result of the Individual Defendants' wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by the Individual Defendants of its trade secrets and/or confidential information, for which there is no adequate remedy at law to compensate.

129.    By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

## COUNT VII
### Breach of Fiduciary Duty/Duty of Loyalty
### Against Glenn Hollenkamp, Steven Collins, Jason Wemitt, and Keith Rager

130.    Plaintiff repeats and realleges Paragraphs 1 – 129 above, and incorporates them as if fully set forth herein.

131.    Ferguson entrusted Hollenkamp, Collins, Wemitt, and Rager with access to confidential corporate information and placed each in a position of trust, thereby establishing a

20560104v.3

fiduciary relationship between Ferguson and Hollenkamp, Collins, Wemitt, and Rager, respectively.

132.    As employees of Ferguson, Hollenkamp, Collins, Wemitt, and Rager owed Ferguson a duty of loyalty to act in Ferguson's best interests while employed by Ferguson.

133.    By the acts described above, Hollenkamp, Collins, Wemitt, and Rager have breached their fiduciary duties, including their duty of loyalty to Ferguson.

134.    As a result of Hollenkamp's, Collins', Wemitt's, and Rager's wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

135.    By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

### COUNT VIII
### Aiding And Abetting Breach of Fiduciary Duty/Duty of Loyalty
### Against Lockwood

136.    Plaintiff repeats and realleges Paragraphs 1 – 135 above, and incorporates them as if fully set forth herein.

137.    Ferguson had a fiduciary relationship with Hollenkamp, Collins, Wemitt, and Rager.

138.    Hollenkamp, Collins, Wemitt, and Rager breached their fiduciary relationship with Ferguson when they conspired to misappropriate Ferguson's trade secrets and induce other Ferguson employees to violate their confidentiality agreements with Ferguson.

20560104v.3

139.    On information and belief, Lockwood induced Hollenkamp, Collins, Wemitt, and Rager to breach their fiduciary relationship with Ferguson by encouraging them to misappropriate Ferguson's trade secrets for Lockwood's benefit.

140.    As a result of Lockwood's wrongdoing, Ferguson has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by the Individual Defendants of its trade secrets and/or confidential information, for which there is no adequate remedy at law to compensate.

141.    By reason of the foregoing, Ferguson requires injunctive relief.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Ferguson has been damaged in an amount to be determined at trial.

**COUNT IX**
**Civil Conspiracy**
**Against All Defendants**

142.    Plaintiff repeats and realleges Paragraphs 1 – 141 above, and incorporates them as if fully set forth herein.

143.    Defendants conspired with each other to misappropriate and convert Ferguson's confidential and proprietary information and trade secrets.

144.    Defendants also conspired to use, and in fact used, this confidential and proprietary information and trade secrets, to solicit Ferguson's customers and interfere with Ferguson's advantageous relationships with such customers.

145.    Defendants, by and through the above-described conduct, entered into a corrupt and unlawful combination and agreement to, by acting in concert, commit unlawful acts by unlawful means, including to unlawfully misappropriate and convert Ferguson's confidential and proprietary information and trade secrets, to unlawfully breach the Individual Defendants' fiduciary duties to Ferguson, to unlawfully interfere with Ferguson's advantageous relationships

20560104v.3

with its customers, and to compete unfairly and unlawfully with Ferguson, rendering Defendants jointly liable for the breaches of each other's obligations.

146.    As a direct and proximate cause of Defendants' conspiracy, Ferguson has and will continue to suffer substantial direct and consequential damages.  Ferguson has and will continue to suffer irreparable harm as a result of Defendants' conduct that cannot be adequately redressed at law.  Unless injunctive relief is granted, Ferguson will be irreparably harmed in a manner not fully compensable by money damages.

## REQUESTED RELIEF

**WHEREFORE,** Ferguson prays that this Court:

A.    Enter an order granting the relief set forth in Ferguson's proposed Order attached to its Motion for Preliminary Injunction;

B.    Enter an Order granting a permanent injunction to the same effect as the proposed preliminary injunction;

C.    Enter judgment in Ferguson's favor and against Defendants jointly and severally, where applicable, for all damages that may be calculated that Ferguson may recover as a result of their misconduct, plus interest;

D.    Award attorneys' fees and costs as allowed by law;

E.    Award double damages pursuant to KRS §§ 365.884; and

F.    Grant such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.**

20560104v.3

Respectfully submitted,


s/ Michael C. Merrick
Michael C. Merrick
Michelle Tupper Butler
DINSMORE & SHOHL LLP
101 South Fifth Street
Suite 2500
Louisville, KY 40202
(502) 540-2321
michael.merrick@dinsmore.com
michelle.tupperbutler@dinsmore.com


Katherine E. Perrelli (*to be admitted pro hac vice*)
kperrelli@seyfarth.com
Erik W. Weibust (*to be admitted pro hac vice*)
eweibust@seyfarth.com
Dallin R. Wilson (*to be admitted pro hac vice*)
drwilson@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Dated:  August 7, 2015          Telephone: (617) 946-4800
Fax:  (617) 946-4801

20560104v.3